IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.                    CRIMINAL NO. 04-52 ERIE

YAKEEN ROGERS


SENTENCING


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Wednesday, October 11, 2006.


APPEARANCES:
        MARSHALL J. PICCININI, Assistant United States
        Attorney, appearing on behalf of the Government.

        THOMAS W. PATTON, Assistant Federal Public

Defender, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1          P R O C E E D I N G S

2

3          (Whereupon, the Sentencing proceedings began at

4   10:00 a.m., on Wednesday, October 11, 2006, in Courtroom C.)

5

6          THE COURT:  This is the time we set for sentencing

7   in the case of United States versus Yakeen Rogers, at Criminal

8   No. 04-52 Erie.  The defendant has filed a Position with

9   Respect to Sentencing Factors, arguing that his career offender

10   status is over-representative.  We'll take up that issue.

11   There was also prepared a second addendum to the presentence

12   report.  Mr. Piccinini, is the government going to be espousing

13   any particular issue here today?

14          MR. PICCININI:  Yes, your Honor, I agree with Mr.

15   Lower's proposition that although obstruction of justice may

16   have occurred, there would be no practical reason for applying

17   two additional points because those points apply prior to the

18   career offender enhancement.  I agree that there should not be

19   additional points applied to Mr. Rogers.  However, I believe

20   that the probation officer's assessment that obstruction of

21   justice and three-point reduction for acceptance of

22   responsibility are inconsistent, that the guidelines authorize

23   this court and we would recommend to this court that because of

24   the defendant's failure to appear for his initial sentencing,

25   that you remove from the guideline calculations the three


                              3


 1   points credit for acceptance of responsibility.  Obstruction of

 2   justice, only in extraordinary cases, can go hand in hand with

 3   reduction for acceptance.  I think the case law and the

 4   guidelines are very clear on that.  When we get to the point of

 5   argument, I will show to the court the Jason Smith case, where

 6   you dealt with a similar issue and made rulings in that regard.

 7          THE COURT:  Is there going to be any testimony?

8          MR. PICCININI:  No, there will not be testimony.

9          THE COURT:  Mr. Patton, why don't we take up --

10  let's start with the 4A1.3 issue.

11          MR. PATTON:  Your Honor, under Section 4A1.3, it is

12  our position that the career offender guideline does

13  significantly over-represent the seriousness of Mr. Rogers both

14  criminal history and offense level that is the result of the

15  consequence of the career offender enhancement.  As your Honor

16  knows, the career offender enhancement not only results in an

17  increase in this case in the criminal history category, but it

18  also calls for a significant increase in Mr. Rogers' offense

19  level.  The Third Circuit made clear in Shoupe that because

                    _____

20  that's the way the career offender guideline operates, that the

21  courts in doing a downward departure in the career offender

22  context under 4A1.3 -- cannot only adjust criminal history

23  categories, but also offense levels.

24          There are three prior convictions that qualify as

25  either crimes of violence or controlled substance offenses for

4

1  Mr. Rogers.  The two controlled substance offenses both involve

2  small amounts of drugs.  In one case they didn't recover any

3  amount of drugs.  Where the sales occurring in basically in an

4  open-air drug market in urban Erie.

5         As the Sentencing Commission had found in its

6  15-year study of the guidelines and how the guidelines have

7  impacted sentencing, the Sentencing Commission itself found

8  that the career offender guideline was disproportionately

9  affecting minority defendants.  Because those minority

10  defendants most often times had prior drug convictions that

11  were the result of selling drugs in what the Sentencing

12  Commission characterizes as open-air drug markets in major

13  urban centers.  In that it's much easier to investigate those

14  types of small drug activity that is going on basically in

15  public view and it's much easier to investigate that and those

16  cases are investigated, people are convicted more often.  Than

17  cases where more effluent people may be using drugs, but

18  they're being more circumspect about how they're obtaining

19  their drugs and their use of the drugs.  When you look at the

20  purpose of the career offender guideline to supposedly punish

21  what are supposed to be high-level drug dealers who have

22  repeatedly sold large amounts of drugs, Mr. Rogers just doesn't

23  fit into that category.  When you compare Mr. Rogers' prior

24  sentences to other defendants who you have sentenced as career

25  offenders, you have a guy who gets convicted of selling around

5

1  eight grams of crack cocaine, and then on the second case he's

2  being used as a runner for someone else and they don't obtain

3  any drugs at all.  While yes, there are prior drug convictions

4  that count under the guidelines, they can only be described as

5  minor.

6       THE COURT:  Is the amount of drugs, excuse me, is

7  the amount of drugs involved in any of the predicate offenses

8  an appropriate consideration for me as to whether or not a

9  departure is justified?

10       MR. PATTON:  I think it is in two ways.  Number one,

11  I think it is absolutely foolish and disingenuous for a court

12  to say I'm going to treat someone who has been convicted of

13  distributing 10 kilos of cocaine in their prior convictions,

14  the same as I'm going to treat someone who has distributed 10

15  grams of cocaine in their priors.  That is simply acting like

16  an ostrich in saying prior drug convictions that's it, I'm not

17  looking at anything more, Mr. Rogers gets treated the same as

18  somebody who's been in front of courts on two separate

19  occasions for dealing kilogram amounts of cocaine.  The

20  guidelines themselves, the whole structure of federal drug

21  sentencing is based on the amounts of the drug that are being

22  distributed.  The penalty scheme under Title 21, U.S. Code,

23  Section 841(b), is linked to the type of drug involved and the

24  amount of drug involved.  That's what sets the mandatory

25  minimums, that's what sets the statutory maximum.  For a drug


6


1  offense under the Sentencing Guidelines where Section 2D1.1

2  applies, the entire base offense level is different by the

3  amount of the drug involved.  So why should it be that when you

4  are getting sentenced for a drug offense in federal court, that

5  the driving factor behind the sentence is the quantity of the

6  drug involved.  Unless you are a career offender.  And then if

7  you're a career offender, the amounts of drugs involved make no

8  difference.  And we treat everybody the same, regardless of how

9  much drugs are involved in the case.  It creates an unexplained

10  and unwarranted disparity in the guidelines.  It is changing

11  the basic sentencing structure of the guidelines.

12        And so for that reason I'd say it is you can look at

13  the amounts.  And, second, another related reason, that relates

14  to the amounts, there is case law that we lay out in our papers

15  that says you can look at the sentences that the defendant

16  received on his prior cases and for someone who has received

17  relatively small sentences in state court, that you as the

18  sentencing judge here can look at those to make it a

19  quantitative determination that those convictions were not as

20  serious as some other convictions that you have seen in the

21  past, and can say that because the prior sentences in this

22  case, I mean on the one case, the conspiracy conviction, Mr.

23  Rogers received 12 months.

24        THE COURT:  Let me ask you this.  Isn't it true,

25  though, that at the end of the day in trying to determine in a


                                7


1  career offender situation whether it's over-representative, the

2  focus is whether or not career offender status inappropriately

3  reflects the likelihood of continuing recidivistic activity,

4  essentially?

5          MR. PATTON:  No, that is one aspect.  Section 4A1.3

6   talks in the disjunctive --

7          THE COURT:  And the other part --

8          MR. PATTON:  Or just overstates, significantly

9   over-represents the seriousness of the criminal history.

10         THE COURT:  Thank you, is in the conjunctive.  But

11   in this particular case, isn't it, aren't I required to get

12   above the trees and look down at the forest.  He has a terrible

13   criminal history, it's repetitive, it's occasionally violent.

14   Isn't it appropriate for me to look at the whole package rather

15   than to focus exclusively on the individual predicate offenses,

16   how can I not do that?

17         MR. PATTON:  When you are ultimately determining the

18   sentence that you feel is appropriate, you of course have to

19   look at all of Mr. Rogers' prior convictions, as well as all

20   the factors that you are directed to look at under Title 18,

21   Section 3553(a).  But the reason in the career offender

22   situation that it is appropriate for you to look at the

23   particular predicates is because that, those particular

24   predicates are what's driving the massive increase in Mr.

25   Rogers' sentence.  Because even if you accept all of Mr.

8

1  Rogers' prior convictions, he should be in criminal history

2  category V under the guidelines, not in criminal history

3  category VI.  The guidelines had taken all that into account.

4  The guidelines, however, carve out particular predicate

5  offenses that will cause a massive increase in a particular

6  defendant's sentence under the career offender guideline.

7  Because the guidelines do that, it is necessary in a career

8  offender case, that you do look at those predicates.  And it is

9  appropriate for you to say, all right, I am now focusing my

10  attention, when you're ruling on our motion under 4A1.3, you

11  have to narrow your universe down to people who qualify for the

12  career offender enhancement.  And then look at, okay, compared

13  to that universe of people, look at the predicates that make

14  Mr. Rogers a career offender.  And try and compare those to

15  other folks that have the career offender apply to them.  And

16  it is appropriate and it is permissible for you to look at it

17  and say, you know, as far as this massive increase that goes

18  along with career offender, based on the predicates that are

19  resulting in that increase, I find that that over-represents

20  the seriousness of the criminal history.

21          Now, then, when you decide what am I going to do

22    about that, you look at all of the criminal history.  And all

23    the other factors under the law that you're entitled to and

24    required to look at, to say, all right, if I'm going to do

25    something about career offender, I'm going to depart, how far

9

1    am I going to go.  Well, I'm not going to go as far with Mr.

2    Rogers as I would with someone who has no other convictions at

3    all, except the two predicates that made him a career offender.

4    So the broader picture does come into play once you have made

5    the decision does the career offender guideline significantly

6    over-represent the seriousness of the criminal history.

7          THE COURT:  All right, I have your point.  Is there

8    something else you want to tell me on the point?

9          MR. PATTON:  The only other thing I would mention is

10    on the simple assault conviction, I understand that this has

11    been briefed to your Honor before and I've argued it to you

12    before, it continues to be our position that because

13    Pennsylvania treats simple assault in a manner that is

14    significantly different than the vast majority of jurisdictions

15  in the United States, that that is a situation where it is

16  appropriate for you to come in and say, look, I understand that

17  the guidelines, in the desire to try and get consistency in

18  sentencing across the country, that the guidelines have a broad

19  general definition of what counts as a crime of violence.  And

20  the states label as a misdemeanor or felony is not controlling.

21  But when one state treats an offense so differently than the

22  rest of the country does, if you hard headedly refuse to

23  acknowledge that this particular state's unique way of handling

24  this is skewing the guidelines, then you are allowing the

25  guidelines to be distorted.  And that's the reason why, even

10

1  when you're treating, looking at the guideline themselves, not

2  even necessarily under your Booker discretion, just calculating
       _____

3  the correct guideline itself, the guidelines say look, judge,

4  there are situations where departures may be appropriate when

5  something is happening that's not foreseen by the Sentencing

6  Commission, that's causing the guidelines to be thrown out of

7  whack.  And Pennsylvania's treatment of the simple assault

8    offense results in that.

9           THE COURT:  All right, thank you, Mr. Patton.  All

10   right, Mr. Piccinini.

11           MR. PICCININI:  Your Honor, first of all, with

12   regard to the argument that the only reason why this defendant

13   is a career offender and at the level he finds himself is

14   because of relatively minor drug dealing activity, there is

15   just a factual inaccuracy on that.  Because the drug dealers

16   that you have sentenced as career offenders, and you will

17   recall this, who dealt larger levels of drugs, the kilos, as an

18   example that was provided to the court today, are actually

19   treated differently under the career offender guidelines.

20           There are different sections of the career offender

21   enhancement.  At the highest level, those individuals who face

22   life imprisonment as a maximum.  And those would be the

23   individuals who have dealt greater than 50 grams of crack

24   cocaine, those are the kilo examples.  They're guidelines under

25   career offender is level 37.  Individuals such as the


11


1    defendant, whose maximum penalty is just greater than 25 years

2   but not greater than life, face a career offender level of 34.

3   So the disparity between those larger level distributors and

4   other equally serious distributors but not by way of the

5   quantity of drugs, are already handled differently under the

6   career offender provisions.  This defendant finds himself at a

7   level 34.  If he was at level 37 prior to pleading, his

8   guideline range would be 360 months to life.

9        Just as other career offenders who have been before

10  you with larger levels of drugs, have faced 360 to life.  This

11  defendant does not find himself in that position.  Specifically

12  because of the maximum penalty that applies, that maximum

13  penalty applies because of the quantity of the drugs that were

14  involved in this offense.  In addition, there is a difference

15  between how 4B1.1, the career offender provision, tells you to

16  look at or what particular offenses to look it, than there is

17  under 4A1.3.

18       Under 4B1.1, you are just to look at those

19  particular offenses that give rise to the career offender

20  status.  That would be the prior drug delivery convictions and

21  the simple assault.  No dispute here that this defendant meets,

22  under any combination of those three, find any two of them and

23  he's a career offender.  However, when we get to 4A1.3, and the

24  defendant has asked for a downward departure from career

25  offender, you're not limited to just looking at the qualifying

12

1  convictions, simple assault and two prior drug distributions,

2  and that makes sense.

3       Now, what we're looking at is the entire breadth of

4  this defendant's criminal history.  That's what we really want

5  to look at.  Is he a career offender that in light of all his

6  criminal history, even beyond the ones that are specifically

7  calculated in career offender, does he really deserve to have a

8  lower sentence or is he really the career offender that the

9  guidelines look to.  I think your question earlier of counsel

10  is whether you should look at the quantity as to those prior

11  drugs.  And I think there's sound reason why that should not be

12  your focus.  I think it's clear under 4A1.3 that really what

13  you ought to be looking at is the pattern and the timing of the

14  defendant's prior convictions, not the specific details of

15  those offenses.  Because really you're left with the law

16  enforcement determination of how many deals did the defendant

17  engage in.  Or the luck of the defendant having been caught

18  after a smaller level deal, as opposed to a larger level deal.

19  And if you look at one of his priors, you actually find out

20  that there were two separate deliveries, which were charged in

21  the same offense as part of a criminal conspiracy.  So if

22  you're going to look at the facts of those particulars, they

23  don't bode very well for Mr. Rogers.  But I think what you

24  ought to be looking at is the timing and the pattern of his

25  criminal history.  And then determine is he really someone

13

1  whose criminal history is significantly over-represented by the

2  career offender provisions.  And in no way, as you indicated,

3  he has this horrendous prior record, extending back to the age

4  of 13 on.  And I know some of that stuff is juvenile in nature,

5  but look at the whole breadth and length of it.  Look at the

6  pattern and timing of the criminal activity.  What you find is

7  from the age of 13, the defendant sitting here in the courtroom

8  today, you have an extensive pattern of criminal activity.

9  Including crimes of violence, crimes of other drug

10  distribution, very clearly indicating a significant recidivist

11  concern for the court that this defendant does not receive the

12    career offender enhancement at the levels that are requested.

13    And I think counsel's point that the career offender, the 4A1.3

14    provision is in the disjunctive, that it's either or, that's

15    fine, but for the defendant to get a reduction --

16        THE COURT:  I think his point was it was in the

17    conjunctive.

18        MR. PICCININI:  Excuse me, it's in the conjunctive.

19    But the point being is you have to have either one or the

20    other.  He may be able to claim that all his priors are not

21    that serious.  But he can't claim that the defendant does not

22    show over his entire history since the age of 13, a very clear

23    indication of the likelihood that he would commit additional

24    criminal offenses.

25        And the final point on that, look at what the nature


14


1    of the criminal convictions are.  It's the same thing that he's

2    in court for here today.  Now for the third time, and then add

3    to it the simple assault convictions, clearly he is not

4    deserving of a downward departure because of

5    over-representation.  Here, it's likely to be under-represented

6  because he has one conviction even beyond what is necessary for

7  career offender status.

8        THE COURT:  Let's switch gears now, let's address

9  first the government's contention relative to the probation

10  officer's second addendum to the report, which involves the

11  entitlement or lack thereof to the three point acceptance of

12  responsibility?

13        MR. PICCININI:  Although, I have not requested the

14  opportunity to take testimony in this regard, just so there is

15  a factual record in order for you to find that the defendant

16  obstructed justice, this is an obstruction that actually

17  occurred in the court's presence, not requiring any testimony.

18  But I would just refer the court to what is document 33 in the

19  record here, which is your order dated June 19, 2006.  Where

20  you specifically found the defendant failed to appear for

21  sentencing, and that you issued a bench warrant for his arrest.

22        And then, in addition, at document 35 within the

23  criminal record, is United States Magistrate Judge Baxter's

24  determination on the 25th of August, 2006, after the defendant

25  came back into custody at that particular time, detaining him

1   and granting the government's request for detention.  So the

2   period of time during which the defendant remained a fugitive

3   was from the 19th of June, when he failed to appear, up until

4   August of 2006, where he had to have his bond revoked and he

5   was detained pending sentencing here today.  So I would submit

6   for your review those documents, rather than marking them as

7   exhibits because they are part of the record, to support a

8   finding that the defendant failed to appear.  And it's very

9   clear under the law that a failure to appear for sentencing is

10   an indication of obstruction of justice.  Once that finding is

11   made, your Honor, the case law is very clear that both in the

12   guideline itself, as is referenced by the probation officer,

13   and in the case law, and I indicated --

14         THE COURT:  I don't have any case law from anybody

15   on the point.  I found some on my own.

16         MR. PICCININI:  There is one in particular that I

17   knew the court was familiar with, that would be your

18   determination in the Jason Smith 2255 case.  Where there was a

19   claim related to the ineffectiveness of prior counsel.  And in

20   that case the argument by Mr. Smith was that there were

21  circumstances that gave rise to, even though he went to trial,

22  he should have received acceptance of responsibility.  And in

23  your opinion in that case, you made it very clear that Mr.

24  Smith's argument was not worthy of credence because this was a

25  case where you had already found Mr. Smith had obstructed


16


1  justice and you referenced those same provisions that we argue

2  here today, indicating that it is only the extraordinary case

3  where someone can obstruct justice and still receive credit for

4  acceptance of responsibility.

5        THE COURT:  Can I see what I said?

6        MR. PICCININI:  Yes.  I gave a copy of this to

7  counsel.

8        THE COURT:  On the question -- let me come at it

9  this way.  This Application Note 4 to 3E1.1, says that conduct

10  resulting in an enhancement under 3C1.1 ordinarily indicates

11  the defendant has not accepted responsibility for his criminal

12  conduct.  There may, however, be extraordinary cases in which

13  adjustments under both 3C1.1 and 3E1.1 may apply.  Then it goes

14  on to say -- the sentencing judge is in the unique position to

15   evaluate a defendant's acceptance of responsibility.  So then

16   the question which occurred to me was, well, what's the

17   appropriate considerations or what should I take into account

18   in determining whether something is or is not extraordinary.

19   There's some case law out of the Eighth Circuit, some other

20   places, that apply a totality of the circumstances analysis to

21   determine whether a case is extraordinary.  And they say you

22   should consider, among other things, whether the obstructive

23   conduct was an isolated incident.  Whether it was voluntary or

24   involuntary -- let me say that again.  Whether it was

25   voluntarily or involuntarily terminated.  Whether the defendant


17


1   admitted and recanted his obstructive conduct.  And to what

2   degree he accepted responsibility and aided the prosecution.

3   Then the court in this particular case goes on to say the

4   phrase extraordinary cases refers to a narrow set of

5   occurrences that are extremely rare and highly exceptional.

6   That appears to be kind of a commonly accepted test.  How would

7   that test, how would the government apply the facts of this

8   case to that test?

9          MR. PICCININI:  Your Honor, when you look at the

10    totality of the circumstances in a situation where a defendant

11    flees the jurisdiction and fails to appear for sentencing, as

12    opposed to some other obstructive conduct.  What you're looking

13    for, judge, is this defendant, after entering a plea of guilty,

14    truly contrite with regard to the criminal conduct that he

15    engaged in.  Part of his contrition, part of his actual

16    acceptance of responsibility is, obviously, the acceptance of

17    the sentence that will be imposed.  We allow the defendant to

18    remain out on conditions of release after his change of plea.

19    We believed that he accepted responsibility and he will show up

20    to face the punishment before him.  But a defendant who, after

21    pleading guilty and when facing significant time, flees the

22    jurisdiction, under a totality of the circumstances, how can

23    you indicate here today that that defendant who is willing not

24    only to plead guilty to the offense, but also accept the

25    punishment that was being imposed by the court.  And I think if


18


1    you look at those particular facts, because we don't know of

2    any more details.

3        THE COURT:  How long was he gone?

4        MR. PICCININI:  He was gone from June 19th of 2006,

5    at least the date we knew he was not here in court, until

6    August of 2006.

7        THE COURT:  Where did he go?

8        MR. PICCININI:  We had information throughout the

9    investigation that he fled to the Atlanta, Georgia area.

10   Members of the EAGLE Task Force actually had to put out fliers

11   in local newspapers with the defendant's picture, trying to

12   discovery his whereabouts.  We actually sent leads to law

13   enforcement officers in Georgia in order to find the defendant.

14   We were unsuccessful.  I can indicate to the court that Mr.

15   Rogers came back from wherever he was and he was apprehended

16   after turning himself in to law enforcement.

17       THE COURT:  Here in Erie?

18       MR. PICCININI:  Here in Erie, yes.

19       THE COURT:  Did agents go down and look for him?

20       MR. PICCININI:  Agents from here did not have to go

21   down and look for him, but we actually submitted requests for

22   that activity in the Atlanta, Georgia area through the FBI

23   channels.

24       THE COURT:  So, basically, to the extent it may or

25  may not be relevant, you don't know today exactly where he was?


19


1        MR. PICCININI:  We do not, no.  We had information

2  that he was located down there.  He was not apprehended in that

3  location and he did end up coming back to the Erie area.

4        THE COURT:  Was there any indication that he, while

5  on the run, he engaged in any other criminal conduct?

6        MR. PICCININI:  Not that we know of, your Honor.

7  Your Honor, I have a recent example of the difference.  This is

8  a difference where the government had not even requested.

9  We've had recent cases where individuals failed to appear for

10  their change of plea hearing, one that they scheduled on their

11  own.  And by failing to appear for the change of plea, a bench

12  warrant was issued for their arrest, they were on the run and

13  they came.  When they came back, the government was now dealt

14  with assessing have they really negated their acceptance of

15  responsibility.  Well, no, they hadn't accepted responsibility.

16  The day they came back and were arrested, they came in and

17  entered a change of plea.  Well, that's clearly someone who,

18  from the time we look at their conduct at the date of their

19  plea, accepted responsibility from that point on, after

20  accepting responsibility, showed they were worthy of credit.

21  Here's a defendant, however, who enters his change of plea,

22  indicates to the court I'm willing to accept the lumps for the

23  crime I committed, when getting close to the sentencing date,

24  he runs away, judge.  And I understand that he was probably

25  scared, there's a lot of time he's facing.  But there's a

20

1  difference between the person who runs away and is not

2  accepting responsibility and the person who stands before the

3  court, which is the vast majority of defendants who enter pleas

4  of guilty and stand up at the time of sentencing and still

5  maintain their acceptance of responsibility.  And I think

6  because we're lacking some of those facts, I can't argue to you

7  any more, it just seems highly likely that defendants who fail

8  to appear for their sentencings after entering pleas of guilty,

9  are in a completely different position than those defendants

10  who show up for their sentencing and take the sentence that

11  they deserve.

12       THE COURT:  All right, let me hear from Mr. Patton

13  on this.  I need, to the extent you can, I'm flying a little

14  blind on all the details of this flight and whatnot.  Insofar

15  as it is might inform me whether or not this is an

16  extraordinary exception?

17        MR. PATTON:  Your Honor, with regard to the dates,

18  June 19th was the date that the original sentencing was set

19  forth.  Mr. Rogers turned himself into the Erie Police

20  Department across the street on August 24th of 2006.  At that

21  time the Erie Police Department contacted the Marshals and the

22  Marshals came down and took Mr. Rogers into custody.  We had a

23  hearing in front of Judge Baxter the next day, on the 25th.

24  Did not contest that the conditions of bond had been violated

25  and so she entered a detention order.  So I would submit to you


                              21


1  that Mr. Rogers, if you're considering not showing up for the

2  hearing, if you say, okay, that's an obstruction of justice.

3        THE COURT:  It clearly is.

4        MR. PATTON:  It's an isolated incident, it's not a

5  continued pattern of activity.  He voluntarily terminated that

6  conduct by turning himself in.  He wasn't arrested.  He came in

7  of his own volition, realizing that he couldn't go on the way

8  he was, he needed to turn himself in and face the consequences

9  of this case and face the consequences, not only of what he was

10  looking, but the consequences of not appearing.  And so he made

11  that determination that he had made a mistake and he had to

12  rectify it to the best of his ability, which at that point was

13  turning himself in.  Which he did.  And I do think that that

14  allows you to look at the totality of the circumstances and

15  say, okay, from the time he was charged until the time he pled

16  guilty, no obstructive conduct, he came in he pled guilty in

17  front of your Honor.  He then met with the probation office, we

18  did a presentence interview, a presentence report was prepared.

19  His act of obstruction is not showing up for the sentencing

20  hearing.  But he then realized he had made a mistake and turned

21  himself in.  Knowing that turning himself in was going to

22  result in him sitting in front of you getting sentenced for the

23  offense that he pled guilty to and with the extra burden thrown

24  in there that he hadn't shown up, and he knew there was going

25  to be some extra penalties for that.

22

1        So that you can look at the case and say, all right,

2    he pled guilty, he files no motions, just comes in and pleads

3    guilty.  While he did fail to appear, he turns himself in and

4    accepts the consequences of turning himself in and says, all

5    right, I did it, I'll face the music.  And that's what

6    acceptance of responsibility is at the end.  It's the defendant

7    saying look, I'm looking at what I did, I know that it's wrong.

8    And I accept that it's wrong, I'll tell the court that it's

9    wrong and I'll accept the consequences of my actions.  And

10   really by -- by him turning himself in, I guess there is no

11   other way to turn yourself in other than by yourself, but by

12   turning himself in, that in and of itself is an acceptance of

13   responsibility.  Of saying I screwed up and I have to fix it.

14   And the only way to fix it is to march yourself down to the

15   police station.  Knowing that you're looking to going to jail

16   at a minimum of 15-and-a-half years and that's even before the

17   court takes into consideration what they're going to do about

18   your failure to appear, to go into the police station knowing

19   I'm never going to walk out of prison, I mean I'm never going

20   to walk out of custody for a minimum of another 15-and-a-half

21   years.  It's a tough thing to do, but Mr. Rogers did it.

22          I'm not saying that it makes it okay for him not to

23   have appeared initially, of course it doesn't.  But when you

24   are looking at the totality of the circumstances to decide is

25   this a cases that's out of the ordinary, when it comes to


                              23


1   getting obstruction and getting acceptance of responsibility,

2   that is extraordinary.  It is different.  It's different from a

3   person that fails to appear, goes on the run, does everything

4   they can to avoid detection by law enforcement, but law

5   enforcement still tracks them down and arrests them and drags

6   them back.  If you and, again, I'm not saying that it wasn't

7   wrong not to appear for his sentencing.  But if you put

8   yourself in a position of somebody who's panicked and made a

9   really dumb decision because they were looking at a really long

10   prison sentence, then they're sitting there thinking what do I

11   do.  Do I try and tough it out and just hope and pray that I

12   can avoid law enforcement for the rest of my life, or do I just

13   say, well, even if I'm going get caught, I'm going to ride this

14   as long as I can ride it and just make them come and get me.

15   Or do you sit there and think you know what, what I did was

16  dumb, and it was wrong, and I got to do something about it and

17  I got to face the music.  And so even though I know I'm going

18  to go to jail for a long time, I got to go and turn myself in

19  because that's the right thing to do.  Mr. Rogers should not be

20  in the same boat as somebody who fails to appear, goes on the

21  run, does everything they can do to avoid being caught and

22  eventually is only brought back into court to face the music

23  because law enforcement tracked them down.

24      THE COURT:  So basically then, in a nutshell, it's

25  your position that what makes this the extraordinary case,


24


1  where you can still get your acceptance, is the fact that this

2  defendant turned himself in rather than was caught?

3      MR. PATTON:  Correct.

4      THE COURT:  Is that pretty much it?

5      MR. PATTON:  Yes.  And I do think that makes it

6  extraordinary, that it is different than the ordinary.  I would

7  hasten to guess that your Honor hasn't seen a lot of cases

8  where you've issued bench warrants for people who have failed

9  to appear, then the person themselves comes back in and says

10  here I am, I screwed up.

11          THE COURT:  Sometimes they never come back.

12          MR. PATTON:  Yes.  And so that does make the case

13  extraordinary.  Which extraordinary just simply means it's not

14  ordinary.

15          THE COURT:  All right, let me hear what he has to

16  say about this, then we'll start to wind this down.  Is it of

17  some moment, Mr. Piccinini, that rather than continuing to hide

18  wherever he was hiding, that he apparently on his own volition

19  returns to Erie and marches into the police station?

20          MR. PICCININI:  It may be of some moment as to where

21  within the guideline range you sentence the defendant.

22  However, with regard to whether or not his obstruction,

23  obstructive conduct, is the exceptional case where acceptance

24  of responsibility should still apply, I don't think that it is

25  of such moment as to preclude you from denying that acceptance


25


1  of responsibility.  Because here, as we've indicated, this

2  defendant was on the run for three months.  Excuse me, for two

3  months -- for three months, from June through August.  On the

4   run for that period to time, while we've indicated to you that

5   law enforcement was looking for him, they put out notices and

6   fliers in the local newspaper and I'm going to mark one as an

7   exhibit for purposes of the record.  They made contact with

8   other states where the defendant was.  So he knew the pressure

9   was on and that he eventually would be caught.  I don't think

10  that that shows the contrition that is necessary.  And I would

11  provide to the court a case out of the Ninth Circuit, United
                                _____

12  States_v._Thompson, at 80 F.3d 368, a copy of which I already
    _____ __ _____

13  provided to counsel.

14         THE COURT:  Could you say that again, please?

15         MR. PICCININI:  Yes, United_States_v._Thompson,
                                _____ _____ __ _____

16  T-h-o-m-p-s-o-n, this is 80 F.3d 368.

17         THE COURT:  What does it stand for?

18         MR. PICCININI:  This discusses whether or not the

19  defendant after being returned into custody after failing to

20  appear, whether their contrition and the sorrow that they

21  expressed to the court are sufficient for the court to find it

22  to be the extraordinary case.  This isn't one factually that's

23  identical to ours, but I think the language of the court

24  setting forth how that failure to or that ability to give the

25  acceptance of responsibility, even in light of an obstruction,


                                    26


1  is really only in the extraordinary cases.  And, basically, all

2  you have before you, you have no factual reason for the

3  flights.  Something, was there some sympathetic reasons.  Was

4  there a dying family member, was there a child that need to be

5  attended to.  Was there something that caused the flight, other

6  than that lack of acceptance of responsibility.  Here you have

7  not.  Was there anything out there that would indicate both

8  acceptance and obstruction of justice points being appropriate,

9  applicable, and there is not.  And the defendant's claim that

10  he knew he had to do the right thing, I don't think is worthy

11  of extraordinary acceptance application in this case.  I would

12  provide a copy of that particular case to the court.

13          THE COURT:  Are you moving those fliers now?

14          MR. PICCININI:  Yes, your Honor.

15          THE COURT:  What are they again for the record?

16          MR. PICCININI:  This is the FBI's clipping of the

17  EAGLE Task Force notice to local community, with a picture of

18  Mr. Rogers, seeking information about his whereabouts, which is

19  dated July 25, 2006.  The clipping of the Erie newspaper and

20  the FBI indications of their submission to it are on this

21  particular document, I would move this as Government Exhibit 1.

22      THE COURT:  It's admitted.  Before we move on here,

23  Mr. Patton, I guess this is up to you.  Rather than waiting for

24  the allocution part of this sentence, it strikes me that given

25  the paucity of information, the flight and the reasons, all

27

1  those other factors that might be informative to me, that

2  perhaps you might want to make a decision, along with your

3  client, as to whether this would be the time to fill in or

4  connect the dots for me.  I'm going to take a short recess, you

5  can talk to him about that.

6      (Recess from 10:44 a.m.; until 10:55 a.m.)

7      THE COURT:  Mr. Patton.

8      MR. PATTON:  Mr. Rogers would like to make a

9  statement to you now rather than wait until his right of

10  allocution.

11      THE COURT:  Have him come on up to the podium.

12          MR. PATTON:  Mr. Rogers does not want to give a

13  detailed rundown, he doesn't want to cause any problems.

14          THE COURT:  I understand that.  I'm giving you and

15  him an opportunity to address those issues as you see

16  appropriate, that would inform my analysis as to whether this

17  is anything other than the run-of-the-mill absconding case or

18  whether it's extraordinary.

19          MR. PICCININI:  Your Honor, is this his allocution

20  right or is this sworn testimony?

21          THE COURT:  It's about to be sworn testimony.

22          MR. PICCININI:  Then he would be subject to being

23  cross-examined?

24          THE COURT: Yes, he is.  Would you please swear him

25  in.


28


1          THE CLERK:  Would you please raise your right hand.

2          YAKEEN ROGERS, DEFENDANT HEREIN, SWORN

3              DIRECT EXAMINATION

4  BY MR. PATTON:

5  Q.   Yakeen, is it accurate to say you didn't show up for your

6   sentencing when it was first scheduled?

7   A.   Yes.

8   Q.   And after you didn't show up for your first sentencing,

9   was there a period of time where you were just out on the

10  street?

11  A.   Yes.

12  Q.   After you had been out on the street for a couple of

13  months, at some point did you decide to or did you think about

14  turning yourself in?

15  A.   The whole time that I was out there for the two months.

16  Q.   And did there come a point when you did in fact turn

17  yourself in?

18  A.   Yes, August 24, 2006.

19  Q.   How did you turn yourself in, what did you do?

20  A.   I went to the federal building but it was closed, it was

21  like 5:15, 5:30, it was closed.  So I walked across the street

22  to the Erie Police Department and told them I was there to turn

23  myself in.  And they searched the computer for a warrant, they

24  said they didn't have a warrant, what I was turning myself in

25  for, and I told them I had a federal warrant.  Then they called

29

1  the Marshals, they came and placed me in the Erie County

2  Prison.

3  Q.    The Marhsals did?

4  A.    Federal Marshals, yes.

5  Q.    Why did you decide to turn yourself in?

6  A.    Tired, too stressful, tired of running.  I knew it was

7  the right thing to do.  As far as not showing up for the

8  hearing, it was stressful on me, stressful on my family

9  members, and I knew it was the right thing to do.

10  Q.    When you said you knew it was the right thing to do, are

11  you referring to turning yourself in?

12  A.    Yes, I'm referring to turning myself in.

13  Q.    Why did you think it was the right thing to do?

14  A.    It was too stressful on myself.  And I knew that, like I

15  said, that I was doing the right thing by turning myself in.

16  Q.    Did you believe that you were wrong when you didn't show

17  up for your original sentencing?

18  A.    Yes.

19  Q.    Did you think turning yourself in would somehow at least

20  help to account for not showing up originally?

21  A.    I thought it would.

22          MR. PATTON:  Those are my questions, your Honor.

23          THE COURT:  All right.  Mr. Piccinini.

24                    CROSS-EXAMINATION

25   BY MR. PICCININI:


                              30


1   Q.    Mr. Rogers, isn't it true that while you were on the run,

2   you remained in contact with your family members, not only here

3   in Erie but also family members in Virginia and Georgia?

4          MR. PATTON:  I'm going to object, your Honor, that's

5   beyond the scope of what was asked.

6          THE COURT:  I think it is.

7          MR. PICCININI:  My point is going to be that the

8   defendant turned himself in because he had heard, based upon

9   our interviews with his family members in Virginia and Georgia

10   and locally, that we were looking at him and closely on his

11   tail --

12          THE COURT:  You can ask him that.  He and his

13   counsel, he, through his counsel, agreed to do this under a

14   more limited basis.  But I think you can ask the question

15   without getting into the specifics as to who he was with and

16  that type of thing.

17  BY MR. PICCININI:

18  Q.    Mr. Rogers, after law enforcement officers went to the

19  Norfolk, Virginia area and discovered that your sister was

20  deployed, you were aware of the fact that law enforcement

21  actually talked with your sister-in-law's husband to find out

22  where you were, weren't you?

23        MR. PATTON:  Objection.

24        MR. PICCININI:  Judge, I'm not looking to seek

25  anybody's indictment for assisting --

31

1         THE COURT:  Go ahead, ask the question.

2  BY MR. PICCININI:

3  Q.    Isn't it true that you knew that your sister, who was

4  deployed at the time, had been stationed at the Norfolk naval

5  base, that you knew we talked with your brother-in-law there in

6  Norfolk, isn't that true?

7  A.    No, I didn't know that.  I knew she was deployed because

8  a few months prior to me leaving -- excuse me, a few months

9  prior to her leaving out to deployment, they were here in Erie,

10   I knew she was going to be deployed to go out to sea for nine

11   months.

12   Q.   That's not my question.  Isn't it true that you knew that

13   law enforcement officers were looking for you in Virginia?

14   A.   Yes, I heard that they were there.

15   Q.   You heard that from someone telling you that the law

16   enforcement officers were there?

17   A.   Correct, a family member here because this is where I was

18   is here.

19   Q.   Weren't you also familiar with the fact that law

20   enforcement officers went to Georgia, to the Atlanta area, and

21   talked with your uncle there to find you?

22   A.   No, I wasn't.  When the Marshals took me to my hearing

23   pertaining to my bond, that's when someone told me that they

24   had heard that I was in Atlanta.  Which I told them I was not

25   in Atlanta.


                                    32


1   Q.   Did you hear from family members that we thought you were

2   in Atlanta?

3   A.   No, I heard it from -- I don't know his name, him right

4   there, with the orange hoody on.

5   Q.   From Trooper Jeff Tylman from the EAGLE Task Force?

6   A.   Yes.

7   Q.   You mean after you got arrested?

8   A.   Yes, that was my first knowledge of that at all.

9   Q.   And while you were on the run, you're claiming today that

10  you stayed in the Erie area, is that correct?

11  A.   Yes.

12  Q.   Isn't it true that while you were in the Erie area, you

13  had the opportunity to see yourself in the newspaper?

14  A.   Yes.

15  Q.   You saw it on a regular basis?

16  A.   I seen it, yes.

17  Q.   And you saw the fact that law enforcement, they weren't

18  just laying back, they actively were trying to find you in the

19  area, isn't that true?

20  A.   I wouldn't know that because I wasn't out and about, I

21  couldn't be out and about.

22  Q.   Why?

23  A.   Because they would have apprehended me.  I mean, I took

24  the time and thought about what I did and knew it was wrong,

25   that's why I turned myself in on my own.


                                    33


1   Q.   Well, let's talk about June 19, 2006, when you were

2   supposed to show up and face the penalty that Judge McLaughlin

3   was going to impose on you.  Isn't it true that prior to June

4   19th, you sat down and you went through the presentence report,

5   isn't that true?

6   A.   Yes.

7   Q.   Isn't it true that in going go through that report, you

8   found out that you were looking at a sentencing guideline of

9   188 to 235 months?

10  A.   I knew that beforehand.

11  Q.   You probably knew prior to your plea that your guidelines

12  would probably be 188 to 235?

13  A.   I knew that from the time I started consulting with my

14  attorney, he told me the range.

15  Q.   And isn't it true your reason for not showing up on June

16  19th is because there is no way you were going to jail for 188

17  to 235 months; you were not willing and able to do that on June

18  19th, were you?

19   A.    No, it wasn't that, I was scared and stressed out.

20   Q.    You were scared, unwilling to come and accept your

21   punishment on June 19, 2006, that's why you didn't come in?

22   A.    Exactly.  But I myself sat back and thought about what I

23   was doing and knew that it was wrong for me not to show and

24   that's why I turned myself in.  As I said, it was too stressful

25   on myself and I knew I couldn't go on like that.  And that's

34

1   why I turned myself in because I knew it was the right thing.

2   Q.    You're saying that you knew it was the right thing, but

3   when you were first asked the question, you said is was too

4   stressful on you and your family to be on the run like that, so

5   you really turned yourself in because you were sick of being on

6   the run?

7   A.    No, I wasn't on the run, it was the fact that I knew

8   that -- my immediate family was worried about me.  And I told

9   them I'm going to turn myself in.

10   Q.    Because of the pressure from your family or the stress

11   you were putting on your family by being on the run?

12   A.    The stress I was putting on myself.

13  Q.    From being on the run, you couldn't handle the pressure

14  because the EAGLE Task Force had put your name in the paper,

15  people saw that you were on the run, you knew on a daily basis

16  that you were going to get caught, that's what you were

17  stressed about?

18  A.    No, I was stressed out because I was stressed of my own

19  will.

20  Q.    But what were you stressed about, about the fact you were

21  about to get caught, isn't that true; the fact you had to look

22  over your shoulder the whole time that you were out because you

23  were afraid you were going to get caught?

24  A.    That's what I was stressed about, about me, my own will,

25  I wasn't stressed about them -- the task force catching me.


35


1  Q.    So you were stressed because while you're out on the run,

2  you had to look over your shoulder, getting worried you were

3  going to get caught?

4  A.    And I knew it was the right thing to do.

5  Q.    Why wasn't it the right thing to do on June 19, 2006,

6  when you indicated to the judge after you were released,

7  continued to be released on bond, that you'd be here?

8  A.   Because I was thinking about the time, that's a lot of

9  time I was facing.  And I had to sit down and take it all in.

10  After I did that, I turned myself in.

11  Q.   It wasn't enough time for you to take it all in from the

12  time you entered your guilty plea back on March 9, 2006 to June

13  19, 2006, that wasn't a good enough time period for you to take

14  it in and accept the fact that you were going to get sentenced?

15  A.   Apparently I wasn't ready.

16      MR. PICCININI:  That's all I have, your Honor.

17      THE COURT:  Do you have anything else?

18      MR. PATTON:  Yes, your Honor.

19           REDIRECT EXAMINATION

20  BY MR. PATTON:

21  Q.   Yakeen, looking back on it now, do you think it was a

22  mistake for you not to show up on June 19th?

23  A.   Yes, it was.

24  Q.   And if you had to do it all over again, would you show up

25  on June 19th?

36

1  A.  Yes, I would.

2  Q.  And your decision to turn yourself in, when you walked

3  into the police station, did you know you were going to be

4  looking at this 188 to 235 months?

5  A.  Yes, that's what we talked about several times.  As far

6  as the 188 months, well, I'm not going to say I was looking at

7  that, but that would have been the initial time that was being

8  imposed.

9  Q.  Is it fair to say that you knew you were looking at that

10  kind of sentence on August 24th when you walked into the Erie

11  Police Department and said hey, there's a warrant out for me?

12  A.  Yes, I did.

13       MR. PATTON:  Those are my questions.

14       THE COURT:  All right, Mr. Rogers, you can step down

15  now.

16       THE COURT:  This is going to be an order.

17  Presenting pending before the court is an objection filed by

18  the defendant to the probation officer's conclusion that this

19  defendant qualifies for career offender status.

20       MR. PATTON:  Your Honor, we don't dispute that he

21  qualifies for career offender status.

22       THE COURT:  I was about to restate that, I realize I

23   misspoke, let me say that again.  All right, let's start this

24   all over again, this is an order.

25                    ORDER


                              37


1         The defendant has filed objections to the

2    presentence report.  The defendant argues that his career

3    offender status overstates the severity of Mr. Rogers' criminal

4    activity and he is entitled to a downward departure under

5    United States Sentencing Guideline 4A1.3.  Specifically, the

6    defendant argues that his prior drug convictions represented

7    very small amounts of crack cocaine and that he was essentially

8    a "street dealer".  The defendant also argues that it is only

9    by virtue of the peculiarities of Pennsylvania law that his

10   simple assault conviction qualifies as a crime of violence for

11   career offender purposes.

12        In United_States_v._Shoupe, 988 F.2d, 446, 447, (3rd
             _____ _____ __ _____

13   Cir. 1993), the court made it clear that a departure is only

14   warranted where the criminal history category significantly

15   over-represents the seriousness of the defendant's past conduct

16  and future threat to society.  A review of the presentence

17  report in this case reveals that the defendant has engaged in

18  serious criminal activity since his early teens.

19        By way of summary, when he was 13, he pushed a

20  juvenile female, attempted to kiss her, remove her pants,

21  fondled her genital area.  Sometime after that the defendant

22  and another individual followed a 10-year-old girl into an

23  alley, where her money was forcefully removed from her pants.

24  As a result of those incidents, he was adjudicated delinquent

25  on November 16, 1989.  He was placed on juvenile court imposed


38


1  probation and during that period of time additional allegations

2  were filed against him involving forcibly removing a Timex

3  watch.  He was discharged from probation on April 25, 1991.

4  Several weeks after the discharge, allegations of robbery and

5  simple assault were lodged against him in juvenile court.  They

6  involved in part, the defendant placing a man in a head lock

7  and slamming him to the ground, which apparently resulted in

8  injuries.  Adjudication of delinquency was made on October 29,

9  1991.  And he was discharged from intensive probation on

10   February 28, 1995.  About a year after that, he was arrested

11   and charged with criminal conspiracy and two counts of delivery

12   of a controlled substance.  Apparently, although, the offenses

13   involved two separate instances where the defendant had --

14   strike that.  The underlying facts were there were two separate

15   incidents where the defendant sold 5.4 grams and 3.1 grams of

16   crack to an undercover individual.  He pled guilty to all three

17   charges on November 15, 1996, and was sentenced to four years.

18   He was paroled on November 16, 1998, but violated his terms and

19   conditions and he was recommitted.  He was paroled on November

20   18, 1999.  And in February of 2000, he was arrested and charged

21   with simple assault.  After that arrest, but prior to his

22   conviction, he was arrested and charged with possessing a

23   controlled substance, delivery of the same, loitering, two

24   counts of criminal conspiracy and driving without a license.

25   He pled no contest to those charges on December 6, 1996.


39


1   He was arrested at age 24 for simple assault.  That apparently

2   involved the punching of a woman in the face after which her

3   jewelry was taken from her neck.  He was paroled on July 28,

4   2003.  And committed this offense on June 22, 2004.

5        With respect to the defendant's contention that the

6   relatively small amount of drugs justifies in and of itself a

7   departure in this case, I disagree.  The drug quantity alone

8   does not appear to be an appropriate factor in justifying a

9   downward departure for career offender status.  See United
                                          _____

10  States_v._Caldwell, 219 F.3d 1186 (10th Cir. 2000).  To be
    _____ __ _____

11  clear, even if a small drug quantity alone could, under

12  appropriate circumstances, be an appropriate consideration and

13  justify a downward departure, I would not find that a departure

14  was justified here on that basis.  His extensive criminal

15  record that I described above really shows him, in my view, to

16  be a career criminal recidivist.  And there has been in the

17  past no demonstrated efforts at any type of meaningful

18  rehabilitation.

19        The defendant also argues that his simple assault

20  conviction qualified as a crime of violence only because of the

21  peculiar treatment of simple assault under Pennsylvania law.

22  First, I note that he is a career offender without the simple

23  assault conviction by virtue of the previous drug convictions.

24  And, second, it is a crime of violence, that is simple assault,

25   Pennsylvania simple assault, under Third Circuit law.  United

———

40

1   States_v._Dorsey, 173 F.3d 331 (3rd Cir. 1999).  Thirdly, given
——— —— ———

2   his extensive criminal background, it is in my view entirely

3   appropriate to consider the simple assault as a crime of

4   violence in the career offender calculous.

5       The motion for downward departure pursuant to United

6   States Sentencing Guideline 4A1.3, insofar as it relates to his

7   status as a career offender, is denied.

8       MR. PATTON:  Your Honor, just as a matter of

9   clarification, on the simple assault conviction you had

10  indicated that the victim was a female.  That victim was

11  actually a male.

12      THE COURT:  Thank you, Mr. Patton.  Let the record

13  reflect that I misspoke and it was a male.  Now, the government

14  argues that by virtue of this defendant having failed to appear

15  at his sentencing on June 19, 2006, and having been on the run

16  for approximately two months, until August 24, 2006, that he

17  has forfeited his right to the three-point acceptance of

file:///A|/ROGERSEN.TXT

18  responsibility.  First, there is no question but that the

19  conduct engaged in by the defendant represents obstructing or

20  impeding the administration of justice under United States

21  Sentencing Guideline 3C1.1.  Application Note 4 to United

22  States Sentencing Guideline 3E1.1, acceptance of

23  responsibility, provides in pertinent part:

24          "Conduct resulting in an enhancement under 3C1.1,

25          (obstructing or impeding the administration of

41

1          justice) ordinarily indicates that the defendant has

2          not accepted responsibility for his criminal

3          conduct.  There may, however, be extraordinary cases

4          in which adjustments under both Section 3C1.1 and

5          3E1.1 may apply."

6          In United_States_v._Muro, 357 F.3d 743, (8th Cir.

7  2004), the court had the occasion to address the appropriate

8  standard for the court to use in determining whether the facts

9  made out the "extraordinary case."  The court stated:

10          "We apply a 'totality of the circumstances'

11     analysis to determine whether a case is 'an

12     extraordinary case' for purposes of applying the

13     exception."  United_States_v._Honken, 184 F.3d 961,
       _____  _____  __  _____

14     968-69, (8th Cir. 1999).  The district court should

15     consider, among other things, whether the

16     obstructive conduct was an isolated incident,

17     whether it was voluntarily or involuntarily

18     terminated, whether the defendant admitted and

19     recanted his obstructive conduct, to what degree he

20     accepted responsibility and aided the prosecution.

21     Id.  The phrase "extraordinary cases" refers to
       __

22     a narrow set of occurrences that are 'extremely rare

23     and highly exceptional'."  Id. at 969-70.  "It is
                                   __

24     not generally extraordinary when a defendant 'merely

25     ceases obstructive conduct.'  A defendant must earn


                           42


1      an adjustment for acceptance of responsibility by

2      performing positive actions that counter his

3      negative ones."

4        In an effort to fill in some of the factual

5    background so that the court could make a more informed

6    decision as to whether this case in fact represented one of

7    those extraordinary cases, wherein, not withstanding the

8    obstructive conduct, the three-point acceptance of

9    responsibility could nevertheless be obtained.  I suggested,

10   and defense counsel concurred, as to the need for testimony

11   from his client.  And his client chose to do so.

12        Based upon the testimony, I find the following

13   facts, insofar as they may inform my decision on the question

14   of the appropriateness of the denial of the three-point

15   acceptance.  First, I do not view the flight on June 19th as an

16   isolated incident.  The fact remains that the defendant was

17   gone for over two months.  This is not an isolated incident in

18   the sense a discussion with an individual witness where

19   obstruction was alleged might represent an isolated incident.

20        The record reflects that throughout his absence, law

21   enforcement engaged in efforts to capture him, which required

22   some expenditure of resources.  The defendant testified, and I

23   find it truthful, that he ultimately turned himself in because

24   he was too tired and "too stressed."  Those would be natural

25    reactions to being constantly hunted.  So I find that a driving

43

1    force of his coming in was not genuine contrition, but the day

2    in and day out stressors of being on the run.

3        Further, the defendant also indicated in his

4    testimony that during the period of his absence, he was aware,

5    through various sources, that law enforcement were looking for

6    him in various parts of the country.  So it was entirely

7    reasonable for him to conclude that the net was beginning to

8    tighten.

9        It's also of some moment to me that he stayed

10    apparently in the Erie area, and as result of which he

11    indicated that he had to lay low.  Being in the Erie area,

12    rather than at some other distant point in the country or

13    elsewhere, it made it that much easier for him at any point in

14    time to have turned himself in.  He also indicated that he saw

15    his picture in the paper and, of course, was aware that the

16    authorities were looking for him.

17        It is true that in this case the defendant did

18    voluntarily terminate his flee from justice.  But, as I

19  previously indicated, in my view the termination was driven in

20  large measure by the fact that he was simply worn out from

21  running.  The record should also reflect that I received a

22  letter from the defendant, the date of which, which is

23  undated -- it is postmarked October 2, 2006.  And it's in

24  reference to this sentencing.  And he indicates in part the

25  following:  "I'm writing to you about the lengthy sentence that

44

1  will be handed down to me on 10/11/06.  Your Honor, would you

2  please take into consideration the fact that yes, I did flee

3  the state knowing I shouldn't have, that is why I turned

4  myself, Yakeen Rogers, into the authorities of the law.  Your

5  Honor, I'm not in any way stating that I don't accept

6  responsibility because I am.  Your Honor, it's just though I

7  feel I was entrapped, as we know from the investigation report

8  that Kenneth Thompson, my half brother, was the confidential

9  informant at hand."  That, also, in my view doesn't suggest the

10  type of genuine contrition that an extraordinary circumstance

11  in my view would require.

12          Finally, in this case the defendant did not perform

13  and has not performed, in my view, any positive actions that

14  counter his negative ones.  And so I find in this case, based

15  upon a careful review of the record, that this is not the

16  extraordinary case justifying relief.

17        All right, Mr. Patton, we're moving on now to

18  allocution insofar as the sentencing is concerned.  Let me just

19  say something about this jump in guideline range.  I understand

20  full well that it was a very high guideline before.  I

21  understand it's a much higher guideline now.  It's a very high

22  guideline, it is significant.  But for what it's worth, the

23  other message here should be, aside from the fact that he did

24  not qualify, in my view, there was nothing extraordinary about

25  it.  But, although, it does not happen frequently, we can't


45


1  have a situation where people literally flee and are gone for

2  months without any ramification.  This should be on the record,

3  too, there's a deterrent aspect to this.  Now, we're going to

4  move on to the balance of the sentencing.  Mr. Patton.

5        MR. PATTON:   Your Honor, in response to your

6  statement that this sends a message that there's going to be

7  some consequence to not showing up, but the other message it

8  says is if you take off, there's no sense in turning yourself

9  in because you're just going to get whacked.

10      THE COURT:  Quite independent of the deterrent

11  aspect, and I understand there is a ying and yang to that, I do

12  understand that.  But all I'm saying is I did not and do find

13  any anything extraordinary on this record.  And that's my

14  point.

15      MR. PATTON:  Well, my point is, your Honor, to the

16  extent you think that that message is going to get out, to the

17  extent any message gets out from this sentencing, the point

18  that's going to get out is look, you might as well stay out on

19  the street as long as you can because even if you turn yourself

20  in, you're going to get the same sentence as if they go out and

21  they have to arrest you.

22      THE COURT:  Look it, I'm not going to go back and

23  revisit it except to say this.  Well, that's one way to look at

24  it.  The other and in my opinion more productive way to look at

25  it is it forestalls people from doing it in the first place.

46

1                MR. PATTON:  But that assumes people are thinking

2    rationally when they don't show up.  And I know you made your

3    ruling, I'm not trying to talk you out of it.  But there are

4    ramifications to it, to the extent --

5                THE COURT:  Look it, I'm not crazy about giving this

6    huge sentence here.  It's a long, long, long sentence.  And Mr.

7    Rogers would have been far better off not doing what he did.

8    The original sentence was a long sentence.  But it was always

9    in his hands.  So let's move on to the rest of the sentencing.

10               MR. PATTON:  Well, your Honor, I would submit that

11   if you look at, if you just look at the bottom end of the

12   guideline range, you're now talking about a six year and two

13   month increase in the sentence for failing to appear.  I would

14   submit to you that when you -- even if you say you don't find

15   the case is extraordinary in the sense it allows you under the

16   guideline to say that Mr. Rogers should get acceptance of

17   responsibility even though he obstructed justice.  When you are

18   deciding what is an appropriate sentence under 18 U.S.C.

19   Section 3553(a), you can say and take into consideration in

20   that consideration, well, in that context, excuse me, that Mr.

21   Rogers should get some benefit for turning himself in.  I mean

22   regardless of what you think --

23          THE COURT:  I agree with that, you're completely

24   preaching to the choir on that.

25          MR. PATTON:  So I would submit that at most the bare


                              47


1   minimum of the suggested guideline, 22 years, but that you can

2   go below that and exercising your discretion under Booker to

                        ———

3   say that in this particular case, even though it does not

4   amount to an extraordinary case, that Mr. Rogers turned himself

5   in and the various reasons that you gave for that, that it is

6   something that calls for less than 262 months.  Because Mr.

7   Rogers can clearly still receive a sentence that is higher,

8   significantly higher than he would have been looking at had he

9   not failed to appear.  Therefore, it is made clear that if you

10   don't appear for your sentencing, there are consequences.  I

11   don't think you have to increase the sentence by six years to

12   send that message.

13          And so I would submit that you can impose a sentence

14   of lower than 262 months, but higher than even the high end of

15   the range he was looking at of 235 months, say a sentence of

16  240 months, 20 years.  To say look, you're going to get more

17  time if you don't show up.  But also to say you are going at

18  least get some benefit if you turn yourself in.  Even though

19  there's going to be a hit for it and there has been punishment,

20  and I understand that, judge, I don't think anybody could

21  rationally sit in front of you with a straight face and argue

22  that there shouldn't be any increase in punishment for someone

23  who fails to appear for their sentencing.  There has to be.

24  The question is just how much.

25          I would submit that the 240 month sentence would be


                                 48


1  appropriate because it is above of what even his maximum

2  guideline range would have been had he shown up.  But it also

3  recognizes the fact that he did turn himself in.  And, your

4  Honor, anybody who turns himself in after being on the run, if

5  they're going to be honest with the court, they're going to say

6  to the court part of the reason I turned myself in is because

7  being on the run is just no way to live.

8          THE COURT:  All right.  Mr. Piccinini.

9          MR. PICCININI:  Your Honor, although the defendant

10  did testify, he would still have the right to allocution prior

11  to sentence.

12          THE COURT:  I think that's a fair point.  I should

13  have picked up on it myself.  Mr. Patton, does your client want

14  to speak, this is his opportunity at the sentencing phase to

15  speak?

16          MR. PATTON:  May I have a moment, your Honor.

17          THE COURT:  Sure.  Could you come up to the podium,

18  it will be easier for you to use the microphone.

19          THE DEFENDANT:  Your Honor, I know I'm here to be

20  sentenced today for this charge that I received.  And, like I

21  said in the letter, I'm just asking that you can have on my --

22  I mean, I was not a bad person when I was out, I was trying to

23  get my life together.  My brother put me in this situation, it

24  wasn't like that I was out hustling everyday.  I was going to

25  work, I was going TO work and everything, working seven days a

49

1  week.  I had a job babysitting on the side, I was trying to do

2  the right thing.  I wasn't supposed to know, I was not supposed

3  to know my brother was in this situation and he involved me in

4    his situation.  Me being the person, being a brother to my

5    brother, I thought I was doing him a favor for him, but he got

6    me jammed up in his situation.  And now, like I said, I accept,

7    I know I was wrong, but someone has to account for it.  I just

8    ask you have some type of open mind.

9         THE COURT:  All right, thank you, Mr. Rogers.

10         THE DEFENDANT:  Thank you.

11         THE COURT:  All right, Mr. Piccinini.

12         MR. PICCININI:  Your Honor, you were absolutely

13    correct that the sentence that you impose in this community

14    against drug dealers, the word gets out on the street.  I know

15    on a daily basis from talking to members of the EAGLE Task

16    Force.  That maybe Joe down the block, who is a law-abiding

17    citizen, it's not going to make a difference to him.  But drug

18    dealers talk.  And when the word gets out that in Judge

19    McLaughlin's courtroom if you don't show up for your sentence

20    on a federal drug conviction, you're going to get hit.  And

21    what it makes very clear is that when you obstruct justice in

22    the federal court system, there are going to be ramifications.

23    And the thought that imposing that increased sentence in some

24    way will cause people not to turn themselves in, is not that

25    great of a concern, your Honor.  Because those people are

50

1  giving to be living under the pressure that Mr. Rogers was

2  living everyday, worried about law enforcement coming after

3  them.  They're not going to say hey, I'm worried about law

4  enforcement, I might as well stay out.  They're going to feel

5  the presence of law enforcement.  If they don't turn themselves

6  in, they're going to be caught.

7        You have in front of you, your Honor, a defendant

8  who clearly deserves everything he gets here today as a career

9  offender.  And this is hard lesson for anyone to learn.  When

10  he talks about how he was doing good while he was out, he has

11  never done good while he was out.  In drug deals or drug

12  convictions one and two, you look at the history throughout the

13  course of his way in which he acted in this community while on

14  parole or probation or some lesser form of confinement, and he

15  failed in that regard.  When you look at whether he learned a

16  lesson after the first crack deal, about stopping selling crack

17  on the street.  He didn't learn that in the first, he didn't

18  learn that in the second.  Now, after the third, what you hear

19  during his right of allocution is that come on, this isn't that

20  big of deal, I just sold to my step brother.  Well, it is a big

21  deal.  It was a big deal when you sold crack the first two

22  times, it's a big deal today.  I don't care what the quantity

23  is, it's a big deal.  You're a drug dealer, you were given

24  multiple opportunities from the age of 13 to straighten out

25  your life.  I can never figure it out and it's unfortunate when

51

1  I read this defendant's background because I knew before this,

2  just from reading the background, that he'd be back committing

3  crimes again.  That's a shame in the system.  Well, he's done,

4  he won't be back again.  The sentence within the guideline

5  range, and I give the defendant the fact he turns himself in.

6  There is a significant range between 262 months and 327 months.

7  Because he turned himself in, he doesn't deserve the 327

8  months.  But a sentence at the low end of that guideline range,

9  the lowest sentence you can give him under the guideline range,

10  serves the purposes of making it clear that he did get credit,

11  he lost some 55 months or so from what he could have gotten

12  here today because of the things that we learned today about

13  him turning himself in.  But he doesn't deserve any break

14    larger than that.  To give him a sentence of 240 months is only

15    five months higher than the high end of the guideline range had

16    he not failed to show up for sentencing.  And I think all of

17    this unfortunate.  Nobody wants to walk through this courtroom

18    and have this man leave facing a 262 month sentence.  But it's

19    nobody's fault in this courtroom that he's getting it.  This

20    all goes back to Mr. Rogers.  And even while released on

21    conditions of bond in this courtroom, he couldn't even show up

22    to stand up and take the punishment, which several months ago

23    would have been a lot shorter than it is today.  And I agree

24    with the court that there has to be a consequence, and a 262

25    month sentence metes that out.


52


1          THE COURT:  I make the following findings.  Given my

2    previous rulings, the total offense level applicable is 34.

3    With a criminal history category of VI.  Statutory provision as

4    to custody not less than 5 to 40 years imprisonment.

5    Guidelines 262 to 327 months.  Statutory provision as to

6    probation ineligible.  Also ineligible under the guidelines.

7    Statutory provision as to supervised release at least four

8   years.  Guidelines four to five.  Statutory provision as to a

9   fine $2 million.  The guidelines $17,500 to $2 million.

10   Restitution is inapplicable under both.  A special assessment

11   of $100 applies with respect to both.

12          All right, would you stand up, Mr. Rogers, please.

13          In fashioning this sentence, I am required to

14   consider various factors.  The nature and circumstances of the

15   offense.  I have done that.  Of course, this is a serious

16   offense.

17          The background of this defendant.  As I indicated

18   more fully on the record here today, that background reflects a

19   long and steady period of criminal activity sufficient at the

20   end of the day to support the career offender status, as part

21   of the calculus into his background.

22          Of course, I also note the fact that part of the

23   guideline range here is driven by the failure to appear, and

24   his absconding for two months.  However, I also take into

25   consideration the fact that at the end of the day, so to speak,

53

1   he did turn himself in, rather than actually having been

2  captured by law enforcement officials.

3        A sentence here should reflect and appropriately

4  reflect the deterrent value of a sentence, as well as

5  protection of the public.  So I've considered all those

6  factors.

7        Pursuant to the Sentencing Reform Act of 1984, it is

8  the judgment of the court that the defendant, Yakeen Rogers, is

9  hereby committed to the custody of the Bureau of Prisons to be

10  imprisoned for a term of 262 months.

11        Upon release from imprisonment, the defendant shall

12  be placed on supervised release for a term of four years.

13        Within 72 hours of release from the custody of the

14  Bureau of Prisons, the defendant shall report in person to the

15  probation office in the district to which this defendant is

16  released.  While on supervised release, the defendant shall not

17  commit another federal, state or local crime, shall comply with

18  the standard conditions of supervision recommended by the

19  Sentencing Commission and adopted by this court, and shall

20  comply with the following additional conditions.

21        The defendant shall not illegally possess a

22  controlled substance.

23          The defendant shall not possess a firearm or

24  destructive device.

25          The defendant shall participate in a program of


54


1  testing and, if necessary, treatment for substance abuse as

2  directed by the probation officer, until such time as the

3  defendant is released from the program.

4          Further, the defendant shall be required to

5  contribute to the costs of services for any such treatment in

6  an amount determined by the probation officer but not to exceed

7  the actual cost.

8          The defendant shall submit to one drug urinalysis

9  within 15 days after being placed on supervision and at least

10  two periodic tests thereafter.

11          It is further ordered that the defendant shall pay

12  to the United States a special assessment of $100, which shall

13  be pay to the United States District Court Clerk forthwith.

14          I find this defendant does not have the ability to

15  pay a fine and so I will waive a fine in this case.

16          Mr. Rogers, do you understand that you do have the

17  right to appeal this sentence which I imposed here today, but

18  in order to do so, you must do so within 10 days; do you

19  understand that, sir?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Is there anything that needs to be

22  dismissed?

23          MR. PICCININI:  No, your Honor, there is just one

24  count.

25          THE COURT:  All right, we're adjourned.


                              55


1          (Whereupon, at 11:44 a.m., the Sentencing

2  proceedings were concluded.)

3

4                  - - -

5

6

7              C E R T I F I C A T E

8

9

10

11     I, Ronald J. Bench, certify that the foregoing is a

12  correct transcript from the record of proceedings in the

13  above-entitled matter.

14

15

16

17

18  _____

19  Ronald J. Bench

20

21

22

23

24

25